# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Abshir Mohamed Hussein, as trustee for the next of kin of
Abdirashid Hussein, deceased,

                Plaintiff,

v.

Minnesota Department of Human Services,
MaLinda Henderson, in her individual capacity;
Melissa Yotter, in her individual capacity;
Melissa Dimmick, in her individual capacity;
Connie Ryan, in her individual capacity;
Taylor Kassube, in her individual capacity

                Defendants.

**Complaint**

**Jury Trial Demanded**

For his Complaint, Plaintiff Abshir Mohamed Hussein ("Plaintiff") as trustee for the next of kin of Abdirashid Hussein ("Hussein") states and alleges upon knowledge, information, and belief as follows:

## **Introduction**

1. Abdirashid Hussein was a father, a veteran of the Minnesota National Guard, and a devout Muslim who was tragically murdered by his roommate at the Forensic Mental Health Program ("FMHP") in December 2023.

2. That roommate, David Otey, had a long history of delusional and violent psychosis, including murdering his sister in 2018. Despite this, defendants allowed him to play violent video games in a common room area, in full view of all staff.

3. In the midst of his mental health already unraveling, Otey played one of those violent games, triggering a psychosis similar to the one that caused him to murder his sister, this time causing him to viscously murder Hussein.

4. Hussein's brother now brings this action under 42 U.S.C. § 1983, along with supplemental state law wrongful death claims, to seek accountability for Hussein's death, as the direct and proximate result of Defendants' deliberate indifference to Hussein's welfare and their negligence.

**Jurisdiction and Venue**

5. This Court has original jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourteenth Amendment to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(3). These statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

6. Plaintiff also asserts supplemental state law claims for wrongful death through negligence. These state law claims are so related to the civil rights claims, over which this Court has original jurisdiction, that they form part of the same case or controversy, as all of the alleged conduct arises from a common nucleus of operative facts. Therefore, this Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

7. The relevant acts and omissions occurred in the State of Minnesota; therefore, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

8. The notice requirements of Minn. Stat. § 3.736, subd. 5 have been satisfied, to the extent necessary, as each government actor or entity herein had sufficient

facts to reasonably put them on notice.

## Parties

9. Hussein was at all relevant times a 36-year-old male resident of Minnesota.

10. Plaintiff was appointed as Trustee for the Next of Kin of Hussein on June 12, 2025, by the honorable Allison Krehbiel, court file number 52-CV-25-287.

11. Defendant Minnesota Department of Human Services ("DHS") is an agency and political subdivision of the State of Minnesota, subject to suit under Minn. Stat. 3.736.

12. At all relevant times DHS operated the FMHP and FMHP employees are thus employees of DHS and the State.

13. All acts and omissions of DHS and its employees when providing services related to Hussein are the acts and omissions of the State.

14. The DHS employees at FMHP work under color of state law for purposes of 42 U.S.C. § 1983.

15. At all relevant times, Defendants owed Hussein and other patients at the FMHP a nondelegable duty of care to ensure that they receive legally sufficient medical care and to take reasonable measures to guarantee safety from attacks by other patients.

16. At all relevant times, APRN, CNP MaLinda Henderson ("Henderson") was an adult resident of Minnesota, was employed by DHS as a nurse practitioner, provided medical treatment, including prescriptions to David Otey, and acted under color of state law. Henderson is sued in her individual capacity.

3

17. At all relevant times, Melissa Yotter was an adult resident of Minnesota, was employed by DHS as a Registered Nurse, provided medical treatment to Otey and acted under color of state law. Yotter is sued in her individual capacity.

18. At all relevant times, Melissa Dimmick was an adult resident of Minnesota, was employed by DHS as Licensed Practical Nurse, provided medical treatment to or supervision of Otey, and acted under color of state law. Dimmick is sued in her individual capacity.

19. At all relevant times, Connie Ryan was an adult resident of Minnesota, was employed by DHS as a Human Services Support Specialist (HSSS), provided medical treatment to or supervision of Otey, and acted under color of state law. Ryan is sued in her individual capacity.

20. At all relevant times, Taylor Kassube was an adult resident of Minnesota, was employed by DHS as a HSSS, provided medical treatment to or supervision of Otey, and acted under color of state law. Kassube is sued in her individual capacity.

**FACTUAL BACKGROUND**

21. Hussein had a history of significant mental illness, including diagnoses of schizoaffective disorder and bipolar type. Hussein was involuntarily to the FMHP, formerly known as the Minnesota Security Hospital, in 2013 and again in 2020.

22. Hussein was making significant progress at the FMHP. In July 2022, a special review board recommended that he be moved to the North Campus of the FMHP.

23. In December 2022, he moved into a room with David Otey.

24. Prior to becoming Hussein's roommate, Otey repeatedly experienced delusional beliefs, had a history of responding to internal stimuli, and a history of bipolar disorder with mania and violently attacked and killed his sister.

25. In January 2018, Otey was in a delusional state and responding to internal stimuli when he repeatedly stabbed his sister "until the hate was gone," as he would later describe. He said he killed his sister due to hearing a "weird command."

26. In March 2019, Otey was found not guilty by reason of mental illness for that crime.

27. In February 2020, he was committed as mentally ill and dangerous to the FMHP.

28. By September 2022 Otey was making significant progress in his treatment, and moved to the North Campus.

29. Notably, from November 2022 through December 2023, Otey was identified as having the following signature risk signs: isolating and not interacting with others, expressing delusional thinking, and becoming irritable.

**THE FMHP NORTH CAMPUS AND POLICIES ON VIDEO GAMES**

30. The North Campus is a 32-bed facility located at the FMHP. It is considered an "unsecure" part of the campus and houses MI&D individuals who have made sufficient progress to be on track to be transitioned back to the community.

31. The North Campus has a shared common area and activity room, which includes a gaming console.

32.     This community room is in full view of all patients and staff on the North

Campus, including defendants, as depicted:



33.     DHS provided the gaming system to the community room.

34.     DHS and FMHP policies prohibited the use of criminogenic-themed video

games.

35.     The Policy on Media Possession by Patients, Policy Number 420-3005,

"limits patient access to certain media to support a therapeutic environment and maintain

the safety and security of the campus for patients, staff and the public.

36.     The policy prohibits "criminogenic-themed video games such as first-

person shooter games," which is defined as  games "promoting, supporting or

encouraging of criminal (i.e. illegal, unlawful, lawless) thinking, attitudes or behaviors."

37. Despite this policy, the gaming system in the activity room contained games with violent themes, including games depicting murder and violence.

38. The night he killed Hussein, Otey was in the activity room playing the video game Assassin's Creed Valhalla. The game is rated "M" for mature due to blood and gore, partial nudity, sexual themes, strong language and use of drugs and alcohol.

39. The game's protagonist wields an ax or sword to bludgeon and murder other characters in a life-like manner, as depicted below:



40. Otey's medical providers, including defendants, knew Otey had access to and was playing this video game, in violation of FMHP policies.

41.     During all relevant times, Otey's providers, including the individual defendants, failed to stop Otey from playing this video game, in violation of FMHP policies.

**OTEY'S DECLINE**

42.     Otey was approved for pass-eligible status in September 2023, which would allow him to temporarily leave the FMHP campus for trips into the community.

43.     In fear of their safety, on September 27, 2023, Otey's family members filed court petitions for Harassment Restraining Orders (HRO) against him.

44.     The next day, Otey was served with the HROs, which were effective immediately, meaning he could not have any contact with his family.

45.     Otey's psychologist and care providers, including defendants, were made aware of the HROs.

46.     Prior to being served with the HROs, Otey was considered an exemplary patient. He consistently followed his treatment plans, including attending all of his group and individual therapy sessions, and regularly went to his job on the FMHP campus.

47.     The HROs trigged what a court-appointed psychologist, would call "the onset of decline," which included Otey's mood significantly changing, an increase in anxiety, loss of sleep, and missing work on the FMHP campus.

48.     Otey's GPS monitor had previously been removed in July 2021, but he was required to wear it again sometime in late 2022 or early 2023.  His daily schedule did not allow him time to recharge the device during the day, requiring him to stay up into the night to charge it, changing and eroding his sleep schedule.

8

49. Sleep deprivation is well-known to increase impulsivity, dysregulate emotions, worsen psychiatric symptoms, and heighten the potential for relapse for people who are mentally ill and dangerous.

50. On October 11, 2023, Otey complained to staff and Henderson about feeling quite anxious and having difficulty sleeping due to the stress of the HROs. Henderson prescribed him with Vistaril and Trazodone for the anxiety and help with sleep.

51. On October 12, 2023, Otey missed work again and informed staff it was due to the stress over the HROs.

52. On October 17, 2023, Otey had a session with defendant Lenhardt.

53. During this session, Otey disclosed that the HROs were "the most stressful thing he has experienced" since murdering his sister and that they were "pushing him toward the edge of a full relapse." Otey also had thoughts that Lenhardt was "conspiring with his family" to have him killed.

54. Despite this, Lenhardt made no changes to Otey's treatment plan.

55. On October 19, 2023, Otey had an urgent care session with Henderson, where he told her that his ex-wife may try to harm him at an upcoming court hearing.

56. Despite this, and also being aware of the disclosures Otey made to Lenhardt, Henderson determined that Otey "demonstrates no imminent risk to harm himself or others" and made no changes to his treatment plan.

57. The HRO hearing was held on November 7.

58. On November 8, 2023, Otey again met with Nurse Practitioner Henderson and described how he planned to challenge the HROs. Henderson paused Otey's weekly passes due to his recent stressors and placed him on routine observation.

59. On November 10, 2023, Otey asked an FMHP HSSS to look up the legal definition of homicide for him. He spent the evening pacing on the unit. Despite this, no changes were made to his treatment plan.

60. On November 28, 2023, the HROs filed against Otey by his family were granted.

61. The court referee specifically noted that Otey was attempting to communicate with his family, and that those communications, "reflect that (Otey) appears to have no insight into the effect that the homicide has had on (his family)" and "the communications of Respondent are objectively unreasonable, and a reasonable person under the circumstances of Petitioner would feel that their safety, security and privacy was impacted."

62. Defendants took no action to address the concerns raised by the court referee nor made any changes to his care plan.

63. Additionally, in or around December 2023, Hussein actually reported to FMHP staff that he was concerned that Otey could harm him, but this concern was ignored and never documented.

64. On December 14, 2023, Otey met again with Nurse Practitioner Henderson, and told her that his emotions were heavy because he was unable to call his son due to the HROs. Despite this, Henderson made no substantive changes to his care plan.

65. Throughout the fall of 2023, Otey's behavior with staff became more adversarial, with him becoming angry with them at minor things.

66. Critically, this irritability was one of Otey's signature risk signs from Otey's Master Treatment Plan. Despite this, no substantive changes were made to his care plan or supervision.

67. Additionally, two staff members – including Defendant Kassube – reported hearing rumors that Otey was planning revenge against a staff member who operated the transit bus because the staff member upset Otey.

68. FMHP staff failed to investigate those reports and took no action against Otey.

69. From December 21 to December 29, 2023, FMHP staff wholly failed to document any progress notes for Otey, despite his worsening condition.

70. On December 29, 2023, Otey requested to be excused from work due to having a fever. Otey reported that he was feeling like garbage and that he did not sleep well.

71. On December 30, 2023, Otey continued to feel poorly and reported soreness and difficulty sleeping.

**HUSSEIN'S MURDER**

72. By December 31, 2023, Otey had repeatedly reported loss of sleep, had missed numerous days of work, become more irritable and adversarial with FMHP staff, and reported that the HROs filed by his family were pushing him toward a full relapse, all

of which was documented in his FMHP records, and available to and known by the individual defendants.

73. The individual defendants knew that Otey responded to internal stimuli when he was psychologically decompensated (lost the ability to maintain normal psychologic defenses or to cope).

74. On the evening of December 31, 2023, RN Yotter, HSSS Kassube, LPN Dimmick and HSSS Ryan were working on the North Campus Unit.

75. All four individual defendants were aware that Otey and other patients on the unit had access to violent video games.

76. All four individual defendants were aware that Otey was playing a violent video game in the common room in violation of FMHP policies.

77. By about 11:30 p.m., all of the patients were in their rooms, except for Otey, who was still in the community room playing video games. RN Yotter noted that this was "usual" for him.

78. Despite Otey's known psychiatric decompensation, lack of sleep and violent history, he was allowed to play a violent video game until about 12:30 a.m. on January 1, 2024.

79. As he was playing Assassin's Creed Valhalla, Otey later reported that he heard his ex-wife's maiden name, which was similar to Hussein's last name.

80. Otey became disoriented and confused. He started to feel scattered and began responding to internal stimuli.

81. Otey believed that he could rescue his children.

82. He then walked to the room he shared with Hussein and heard a voice in his head tell him, "Hey, grab that guitar."

83. Otey grabbed a guitar and swung it like an ax, as the protagonist does in Assassin's Creed Valhalla. He repeatedly hit Hussein in the head.

84. Hussein was still breathing, so Otey choked him with the guitar strap. Hussein continued to struggle, causing Otey to believe that Hussein was immortal.

85. Otey went to the front desk, where he informed Defendants Dimmick, Yotter, Kassube, and Ryan that he had hit Hussein with a guitar, and that they should go check on him.

86. Yotter and Ryan went back to Hussein's room, where he was lying on his bed with his head smashed by the guitar.

87. When a police officer arrived, he noted that Otey "appeared to be twitching, had loud, deep, rapid breathing, and exhibited a 'thousand-yard stare' with a blank expression on his face."

88. Hussein was found with significant injuries to the head and was taken to a nearby hospital, where he was pronounced dead.

89. Hussein's cause of death was determined to be homicidal violence due to assault, including:

a. Multiple lacerations, abrasions and contusions.

b. Petechial hemorrhage, sclera and conjunctiva.

c. Nasal bone fractures.

d. Subgaleal hematoma, predominately right frontal, temporal and occipital.

e. Skull fracture.

    i. Right orbital plate.

    ii. Right sphenoid/temporal bone.

f. Cerebral contusions.

    i. Left lateral temporal lobe, left lateral occipital lobe and left lateral cerebellum.

g. Bilateral peri clavicular hemorrhage/neck strap muscle hemorrhage.

h. Peri vertebral cervical hemorrhage.

90. After being taken to the Nicollet County Jail, Otey continued to demonstrate psychotic and aggressive behaviors, including kicking and punching the walls in his cell, and running full speed into a holding cell wall.

91. On January 2, 2024, Otey was charged with 2nd degree murder and 2nd degree assault for his attack on Hussein.

92. Dr. James Gilbertson was appointed to assess whether Otey would have a defense of mental illness when he killed Hussein.

93. Gilbertson reviewed Otey's FMHP medical records and interviewed Otey.

94. Gilbertson noted that Otey's records were "replete with responding to internal stimuli aka hallucinations when psychiatrically decompensated."

95. Gilbertson further noted, "the 'unraveling' of Mr. Otey's stability in 2023 was clearly documented," noting a "marked decline and instability after receiving the HRO/OFP's [sic] at the end of September[.]"

14

96. As part of his assessment, Dr. Gilbertson watched the trailer for Assassin's Creed Valhalla. He noted:

"I was immediately aghast and experienced an intense fight-flight response as I witnessed medieval sword fights with individuals being maimed, slashed, beheaded, impaled, axes thrown at their heads, etc. in a lifelike setting. With all due respect to his treatment team, I find it incredulous that individuals with serious and persistent mental illness with classifications as Mentally Ill and Dangerous would have access to this type of violent media."

97. Dr. Gilbertson concluded that in his clinical opinion, Otey would have a defense of mental illness available to him.

98. Dr. Scott Fischer was also appointed to evaluate whether Otey would have a mental illness defense.

99. Dr. Fischer concluded that Otey's actions in killing Hussein "clearly suggest serious mental health symptoms and, very likely, clinical mania."

100. Dr. Fischer recommended that Otey be found not guilty by reason of mental illness.

101. On June 4, 2024, the Honorable Allison Krehbiel found Otey not guilty by reason of mental illness for killing Hussein.

102. Krehbiel determined that Otey's "violent attack on Mr. Hussein is not explained by anything other [than] the fact that he was then experiencing active symptoms created by his major mental illness."

103. At all relevant times, Hussein was involuntarily committed to the FMHP as a person adjudicated mentally ill and dangerous and was therefore wholly dependent upon Defendants for his safety, medical care, housing, supervision, and protection from known violent patients.

104. Defendants knew that Otey had previously committed homicide during a psychotic episode, had recently experienced escalating psychiatric decompensation including insomnia, paranoia, responding to internal stimuli, fixation on violence, and increased irritability/agitation, and nonetheless housed him in the same room with Hussein without increased supervision, separation, or restriction of violent media stimuli.

105. Defendants further knew that Otey had recently expressed that he was being pushed toward relapse, exhibited paranoia toward providers, asked staff to define "murder," paced the unit, and was the subject of family HROs granted due to fear for their safety, yet failed to modify his treatment plan, supervision level, housing assignment, or media access.

106. Allowing a known mentally ill and dangerous patient with a documented history of homicidal psychosis and current signs of psychiatric decompensation to access violent, homicidal-themed video games late at night without increased supervision created an obvious and substantial risk of serious harm to Hussein, other residents, and staff.

107. Defendants had authority to restrict Otey's housing placement, media access, privileges, supervision level, and treatment plan but failed to take reasonable measures to abate the substantial and known risk of serious harm.

16

<u>**Count I**</u>
**42 U.S.C. § 1983**
**Fourteenth Amendment Violations**
**Defendants Yotter, Dimmick, Ryan, and Kassube**

108.    Plaintiff realleges and incorporates Paragraphs 1–107.

109.    At all relevant times, Hussein was an involuntarily committed patient entitled under the Fourteenth Amendment to reasonably safe conditions of confinement and protection from known substantial risks of serious harm.

110.    Defendants Yotter, Dimmick, Ryan, and Kassube were acting under color of state law.

111.    Defendants Yotter, Dimmick, Ryan, and Kassube were subjectively aware of Otey's documented homicidal history, his recent psychiatric decompensation, his responding to internal stimuli, escalating agitation, sleep deprivation, paranoia, and fixation on violence.

112.    These Defendants knew that Otey posed a substantial risk of serious harm to other residents, including Hussein.

113.    Despite this knowledge, Defendants Yotter, Dimmick, Ryan, and Kassube failed to take reasonable measures to protect Hussein, including but not limited to:

a. Separating Otey from Hussein;

b. Increasing supervision or monitoring;

c. Restricting access to violent or criminogenic media;

d. Conducting a meaningful reassessment of risk following the HRO proceedings;

f. Implementing heightened safety precautions.

17

114. Defendants Yotter, Dimmick, Ryan, and Kassube's conduct constituted deliberate indifference to Hussein's constitutional right to reasonably safe conditions of confinement.

115. As a direct and proximate result, Plaintiff suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

116. Punitive damages are available against Defendants Yotter, Dimmick, Ryan, and Kassube in this Count and are hereby claimed as a matter of federal common law.

117. Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

**<u>Count II</u>**
**Wrongful Death – Minnesota State Law**
***Plaintiff v. All Defendants***

118. Plaintiff realleges and incorporates Paragraphs 1–117.

119. Defendants owed Hussein a duty of reasonable care, including a duty to provide safe housing, adequate supervision, appropriate treatment, and protection from foreseeable harm by other residents.

120. Defendants breached those duties and deviated from professional standards of care by:

a. Failing to monitor and supervise Otey appropriately;

b. Failing to modify treatment despite obvious signs of relapse;

c. Failing to restrict violent media access;

d. Failing to protect Hussein from foreseeable violent assault.

121. Defendants' wrongful acts and omissions directly and proximately caused Hussein to suffer damages in the form of pain and suffering and loss of enjoyment of life and Hussein's next of kin have incurred funeral and burial costs, as well as other damages in connection with Hussein's death, including but not limited to loss of the advice, comfort, assistance, companionship, protection, counsel, guidance, aid, and future relationships and other contributions Hussein would have provided to them had he lived, in an amount to be determined by a jury.

122. Pursuant to Minn. Stat. § 573.02, Plaintiff, as trustee for Hussein's next of kin, is entitled to recover damages.

123. Plaintiff hereby claims punitive damages against the Defendants Yotter, Dimmick, Ryan, and Kassube under Minn. Stat. § 549.20 as these individual defendants showed a deliberate disregard for Hussein's rights and safety.

124. Plaintiff has supplied a declaration of expert review pursuant to Minnesota Statute § 145.682, subd. 3.

**Plaintiff hereby demands a trial by jury.**

## Prayer for Relief

WHEREFORE, Plaintiff Abshir Mohamed Hussein, as trustee for the next of kin of Abdirashid Hussein, prays for judgment against Defendants as follows:

1.      As to Count I, a money judgment in excess of $500,000.00 against Defendants Yotter, Dimmick, Ryan, and Kassube for compensatory, special, and punitive damages in an amount to be determined by a jury, together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest.

2.      As to Count II, a money judgment against all Defendants, jointly and severally, for special and compensatory damages in an amount to be determined by a jury but in excess of $500,000.00, in addition to costs, disbursements, and prejudgment interest.  Additionally, punitive damages against Defendants Yotter, Dimmick, Ryan, and Kassube in an amount to be determined by a jury.

3.      For such other and further relief as this Court deems just and equitable.


**STORMS DWORAK LLC**

Dated: March 30, 2026

/s/ Ryan O. Vettleson
Jeffrey S. Storms, #387240
Ryan O. Vettleson, #312915
800 Hennepin Ave.
800 Pence Building
Minneapolis, MN 55403
Phone: 612.455.7055
Fax: 612.455.7051
jeff@stormsdworak.com
ryan@stormsdworak.com

*Attorneys for Plaintiff*